# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| RYAN McMILLAN, individually and on behalf of all others similarly situated,<br><br>v.<br><br>DMS OILFIELD SERVICES, LLC and DMS OPERATING, LLC | **Case No.** _____<br>FLSA Collective Action<br>FED. R. CIV. P. 23 Class Action |

## CLASS AND COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.      Ryan McMillan brings this lawsuit to recover unpaid overtime wages and other damages from DMS Oilfield Services, LLC and DMS Operating, LLC (together, "DMS") under the Fair Labor Standards Act (29 U.S.C. § 201, *et seq.*) ("FLSA"), and North Dakota Century Code 34 and the North Dakota Minimum Wage and Work Conditions Order (N.D. Admin Code § 46-02-07-01, *et seq.*) (together, the "ND Wage Laws").

2.      McMillan and the other workers like him were typically scheduled for 12-hour shifts, 7 days a week, and their hitches routinely lasted for weeks at a time.

3.      McMillan and those similarly situated often worked even more than that, but they were not paid overtime for hours worked in excess of 40 hours in a single workweek.

4.      Instead of paying overtime as required by the FLSA and ND Wage Laws, DMS paid these workers a single day rate for all hours worked and improperly classified them as independent contractors.

5.      This collective action seeks to recover the unpaid overtime wages and other damages owed to these workers under the FLSA.

**JURISDICTION AND VENUE**

6.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the FLSA. 29 U.S.C. § 216(b).

7.      McMillan's claims under the ND Wage Laws form part of the same case or controversy as his FLSA claims under Article III of the United States Constitution.

8.      The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events at issue occurred in this District and Division.

10.     McMillan performed work for DMS in this District and Division.

**THE PARTIES**

11.     McMillan worked for DMS from August to October 2018.

12.     During that time, McMillan worked exclusively for DMS.

13.     McMillan was an operator for DMS.

14.     McMillan was paid a day rate.

15.     McMillan was not paid a salary.

16.     McMillan was not paid by the hour.

17.     DMS classified McMillan as an independent contractor.

18.     McMillan's written consent is attached as Exhibit A.

19.     McMillan represents at least two classes of similarly situated co-workers in this lawsuit.

20.     McMillan represents a class of similarly situated workers under § 16(b) of the FLSA. *See* 29 U.S.C. § 216(b) (the "FLSA class"). This FLSA class is defined as:

> **Current and former operators employed by, or working on behalf of, Defendants as independent contractors in the United States in the past three years who were paid a day rate.**

21.    McMillan represents a class of similarly situated workers under the ND Wage Laws pursuant to Federal Rule of Civil Procedure 23 (the "North Dakota class"). This North Dakota class is defined as:

> **Current and former operators employed by, or working on behalf of, Defendants as independent contractors in North Dakota in the past three years who were paid a day rate.**

22.    Collectively, the FLSA Class Members and the North Dakota Class Members are referred to as "Putative Class Members."

23.    DMS Oilfield Services, LLC is a North Dakota limited liability company. It may be served by serving its registered agent for service of process: **Ian Brothers, 606 24th Ave. SW, Watford City, ND 58854-6837**.

24.    DMS Operating, LLC is a Texas limited liability company that does business in this District and Division. It may be served by serving its registered agent for service of process: **Incorp Services, Inc., 815 Brazos St., Ste. 500, Austin, TX 78701.**

25.    DMS Oilfield Services, LLC and DMS Operating, LLC employed and/or jointly employed McMillan and the Putative Class Members.

26.    DMS Oilfield Services, LLC and DMS Operating, LLC are joint employers for purposes of the FLSA. *See* 29 C.F.R. § 791.2.

### COVERAGE UNDER THE FLSA

27.    At all relevant times, DMS has been an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

28.    At all relevant times, DMS has been part of an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

29.    At all relevant times, DMS has been part of an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise has and has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated).

30.    DMS treated McMillan and the Putative Class Members as employees and uniformly dictated the pay practices to which McMillan and the Putative Class Members were subjected.

31.    DMS's misclassification of McMillan and the Putative Class Members as independent contractors does not alter their status as employees for purposes of this FLSA action.

### FACTS

32.    DMS is an oilfield services company.

33.    DMS employs wellsite consultants to perform its oilfield support work.

34.    Many of these individuals worked for DMS performing the same or substantially similar job duties as McMillan and were misclassified by DMS as so-called independent contractors in connection with DMS's oilfield operations.

35.    While exact job titles and job duties may slightly differ, McMillan and the Putative Class Members were subjected to the same or similar illegal pay practices for similar work.

36.    Specifically, DMS classified the Putative Class Members as independent contractors and paid them the same hourly rate for all time worked, even those in excess of 40 hours in a workweek.

37.    For example, McMillan worked exclusively for DMS from August through October 2018.

38.    Throughout his employment with DMS, McMillan was classified as an independent contractor.

39.    DMS typically scheduled McMillan to work 12-hour shifts, for as many as 7 days per week.

40.    McMillan frequently worked well in excess of 40 hours per week for DMS.

41.    In fact, McMillan frequently worked more than 84 hours per week for DMS.

42.    The work McMillan performed is an essential part of DMS's core business.

43.    During McMillan's employment with DMS and while he was classified as an independent contractor, DMS exercised control over all aspects of his job.

44.    McMillan was not required to possess any unique or specialized skillset (other than that maintained by all other individuals working in his same job position) to perform his job duties.

45.    During the time that McMillan worked with DMS, he worked exclusively for DMS.

46.    DMS controlled all the significant or meaningful aspects of the job duties performed by McMillan.

47.    DMS ordered the hours and locations McMillan worked, tools used, and rate of pay received.

48.    Even though McMillan often worked away from DMS's offices without the presence of a direct DMS supervisor, DMS still controlled all aspects of McMillan's job activities by enforcing mandatory compliance with DMS's and/or its client's policies and procedures.

49.    No real investment was required of McMillan to perform his job.

50.    DMS determined McMillan's opportunity for profit and loss.

51.    McMillan did not provide the equipment he worked with on a daily basis. DMS made the large capital investments in buildings, machines, equipment, tools, and supplies in the business in which McMillan works.

52.    McMillan did not incur operating expenses like rent, payroll, marketing, and insurance.

53.    McMillan was economically dependent on DMS during his employment.

54.    DMS set McMillan's rate of pay and his work schedule and prohibited him from working other jobs for other companies while working on jobs for DMS.

55.    DMS directly determined McMillan's opportunity for profit and loss, as McMillan's earning opportunity was based on the amount of time DMS scheduled him to work.

56.    Very little skill, training, or initiative was required of McMillan to perform his job duties.

57.     Indeed, the daily and weekly activities of McMillan and the Putative Class Members were routine and largely governed by standardized plans, procedures, and checklists created by DMS and/or its clients.

58.     Virtually every job function of the Putative Class Members was pre-determined by DMS and/or its clients, including the tools to use at a job site, the schedule of work, and related work duties.

59.     McMillan and the Putative Class Members were prohibited from varying their job duties outside pre-determined parameters.

60.     Moreover, the job functions of McMillan and the Putative Class Members were primarily manual labor/technical in nature, requiring little to no official training, much less a college education or other advanced degree.

61.     For the purposes of an unpaid overtime claim, McMillan and the Putative Class Members performed substantially similar job duties related to servicing oil and gas operations in the field.

62.     McMillan performed routine manual and technical labor duties that were largely dictated by DMS and/or its clients.

63.     McMillan was not employed by DMS on a project-by-project basis.

64.     While McMillan was classified as an independent contractor, he was regularly on call by DMS and/or its clients and was expected to drop everything and work whenever needed.

65.     All the Putative Class Members performed the same or similar job duties and were subjected to the same or similar policies and procedures by which DMS dictated the day-to-day activities performed by each person. The Putative Class Members also worked

similar hours as McMillan and were denied overtime pay as a result of the same illegal pay practice.

66.    McMillan and the Putative Class Members all worked in excess of 40 hours each week and were often scheduled for 12-hour shifts for days or weeks at a time.

67.    Instead of paying them overtime, DMS paid McMillan and the Putative Class Members a day-rate.

68.    DMS denied McMillan and the Putative Class Members any overtime premium for any hours worked in excess of 40 hours in a single workweek.

69.    McMillan and the Putative Class Members maintained and worked with oilfield machinery, performed manual labor, and worked long hours in the field.

70.    Because McMillan and the Putative Class Members were misclassified as independent contractors by DMS, they should receive overtime for all hours they worked in excess of 40 hours in each workweek.

71.    DMS's policy of failing to pay overtime to its operators, including McMillan, violated the FLSA and ND Wage Laws because these workers were, for all purposes, employees performing non-exempt job duties.

72.    DMS's day-rate system violated the FLSA and ND Wage Laws because McMillan and the Putative Class Members did not receive any overtime premium pay for hours worked over 40 hours each workweek.

### CLASS AND COLLECTIVE ACTION ALLEGATIONS

73.    McMillan incorporates all preceding paragraphs.

74.    The illegal pay practices DMS imposed on McMillan were likewise imposed on the Putative Class Members.

75.    Numerous other individuals who worked with McMillan were improperly classified as exempt, paid in the same manner, performed similar work, and were not properly compensated for all hours worked as required by the FLSA and ND Wage Laws.

76.    The classes are so numerous that joiner of all members is impracticable.

77.    Thus, DMS imposed a uniform practice or policy on McMillan and the Putative Class Members regardless of any individualized factors.

78.    Based on his experiences and tenure with DMS, McMillan is aware that DMS's illegal practices were imposed on the Putative Class Members.

79.    Putative Class Members were all improperly classified as independent contractors and not paid overtime when they worked in excess of 40 hours per week.

80.    DMS's failure to pay wages and overtime compensation at the rates required by the FLSA and ND Wage Laws result from generally applicable, systematic policies, and practices which are not dependent on the personal circumstances of the Putative Class Members.

81.    McMillan's experiences are therefore typical of the experiences of the Putative Class Members.

82.    McMillan has no interest contrary to, or in conflict with, the Putative Class Members. Like each member of the proposed classes, McMillan has an interest in obtaining the unpaid overtime wages owed under state and/or federal law.

83.    A class and collective action, such as the instant one, is superior to other available means for fair and efficient adjudication of the lawsuit.

84.    Absent this action, many Putative Class Members likely will not obtain redress of their injuries and DMS will reap the unjust benefits of violating the FLSA and ND Wage Laws.

85.    Furthermore, even if some of the Putative Class Members could afford individual litigation against DMS, it would be unduly burdensome to the judicial system.

86.    Concentrating the litigation in one forum will promote judicial economy and parity among the claims of individual members of the classes and provide for judicial consistency.

87.    The questions of law and fact common to each of the Putative Class Members predominate over any questions affecting solely the individual members. Among the common questions of law and fact are:

(a)    Whether the Putative Class Members were improperly classified as independent contractors;

(b)    Whether the Putative Class Members were not paid overtime at one and one half their regular rate of pay for hours worked in excess of 40 in a workweek;

(c)    Whether DMS's decision to not pay overtime to the Putative Class Members was made in good faith or on reasonable grounds; and

(d)    Whether DMS's violation of the FLSA was willful.

88.    McMillan's claims are typical of the Putative Class Members claims. McMillan and the Putative Class Members Class Members have sustained damages arising out of DMS's illegal and uniform employment policy.

89.    McMillan knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class or collective action.

90.    Although the issue of damages may be somewhat individual in character, there is no detraction from the common nucleus of liability facts. Therefore, this issue does not preclude class or collective action treatment.

### FIRST CAUSE OF ACTION—FLSA VIOLATIONS

91.    McMillan incorporates all preceding paragraphs.

92.    As set forth herein, DMS violated the FLSA by failing to pay McMillan and the Putative Class Members overtime under its day-rate system for hours worked in excess of 40 in a workweek. 29 U.S.C. § 207(a).

93.    DMS knowingly, willfully, or with reckless disregard carried out this illegal pattern or practice of failing to pay McMillan and the Putative Class Members proper overtime compensation.

94.    DMS's failure to pay overtime compensation to McMillan and the Putative Class Members was neither reasonable, nor was the decision not to pay overtime made in good faith.

95.    Accordingly, McMillan and the Putative Class Members are entitled to overtime wages in an amount equal to 1.5 times their regular rates of pay, plus liquidated damages or double damages, attorney's fees, and costs. 29 U.S.C. § 216(b).

### SECOND CAUSE OF ACTION—ND WAGE LAWS VIOLATIONS

96.    McMillan incorporates all preceding paragraphs.

97.    The conduct alleged in this Complaint violates the ND Wage Laws.

98.    DMS was and is an "employer" within the meaning of the ND Wage Laws.

99.    At all relevant times, DMS employed each member of the North Dakota Class as an "employee" within the meaning of the ND Wage Laws.

100.    The ND Wage Laws requires employers to pay overtime to all non-exempt employees.

101.    The members of the North Dakota Class were and are non-exempt employees who are entitled to be paid overtime for all overtime hours worked.

102.    Within the applicable limitations period, DMS had a policy and practice of failing to pay overtime pay to the North Dakota Class members for their hours worked in excess of 40 hours per week.

103.    Within the applicable limitations period, DMS had a policy and practice of requiring North Dakota Class members to work seven or more consecutive days in a row.

104.    As a result of DMS's failure to pay overtime to the North Dakota Class, DMS violated the ND Wage Laws.

105.    As a result of DMS's requirement that the North Dakota Class Members work seven or more consecutive days in a row, DMS violated the ND Wage Laws.

106.    The North Dakota Class is entitled to recover their unpaid overtime based on DMS's failure to pay 1.5 times their regular rates of pay for work performed in excess of 40 hours in a week, an amount equal to these underpayments as liquidated damages, and such other legal and equitable relief resulting from their violations of the ND Wage Laws as the Court deems just and proper.

107.    The North Dakota Class also seeks recovery of attorneys' fees and costs of this action to be paid by DMS, as provided by the ND Wage Laws.

### RELIEF SOUGHT

108.    Wherefore, McMillan prays for judgment against DMS as follows:

(e)    For an order certifying this case as a collective action pursuant to 29 U.S.C. § 216(b) for the purposes of the FLSA claims;

- 12 -

(f)     For an order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23 for the purposes of the ND Wage Laws claims;

(g)     For an order finding DMS liable for violations of state and federal wage laws with respect to McMillan and all Putative Class Members covered by this case;

(h)     For a judgment awarding all unpaid wages, liquidated damages, and/or penalty damages, to McMillan and all Putative Class Members covered by this case;

(i)     For a judgment awarding McMillan and all Putative Class Members covered by this case their attorneys' fees, costs, and expenses of this action;

(j)     For a judgment awarding McMillan and all Putative Class Members covered by this case pre- and post-judgment interest at the highest rates allowed by law; and

(k)     For all such other and further relief as may be necessary and appropriate.

Respectfully submitted,

*/s/ Matthew S. Parmet*

By: _____

**Matthew S. Parmet**
Texas Bar # 24069719
**PARMET PC**
PO Box 540907
800 Sawyer St. (77007)
Houston, Texas 77254
phone  713 999 5228
fax     713 999 1187
matt@parmet.law

- 13 -

**Edmond S. Moreland, Jr.**
Texas Bar # 24002644
*admission pending*
**MORELAND VERRETT, P.C.**
700 West Summit Dr.
Wimberley, TX 78676
phone  512 782 0567
fax     512 782 0605
edmond@morelandlaw.com

**Attorneys for Plaintiff**